# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8435 | **DATE** | 3/25/2004 |
| **CASE TITLE** | Space Center Tysons, Inc. vs. Opus North Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 5/19/04 at 9:00 a.m.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's motion for summary judgment (Doc. No. 15-1) is granted in part and denied in part without prejudice. This case is referred to Magistrate Judge Bobrick for a settlement conference.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | *3* number of notices | Document Number |
| ✓ | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | MAR 2 6 2004 date docketed | 29 |
| | Docketing to mail notices. | | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| ETV | courtroom deputy's initials | date mailed notice | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SPACE CENTER TYSONS, INC.,
a Minnesota Corporation,

        Plaintiff,

v.

OPUS NORTH CORPORATION,
an Illinois Corporation,

        Defendant.

No. 01 C 8435

Judge Rebecca R. Pallmeyer

## MEMORANDUM OPINION AND ORDER

Plaintiff Space Center Tysons, Inc. ("Space Center") claims that there are material defects in the concrete floors and parking lots of two commercial buildings that Space Center purchased from Defendant Opus North Corporation ("Opus") in late 1997 and 1998. On November 2, 2001, Plaintiff brought this suit for breach of contract and warranty and for misrepresentation in violation of certain agreements between the parties. Opus now moves for partial summary judgment. For the reasons stated below, Opus's motion is granted in part and denied in part.

## FACTUAL BACKGROUND

DOCKETED

MAR 2 6 2004

### I.    Leases

Until 1997, Defendant Opus owned two parcels of real property located in Aurora, Illinois, at 2580 and 2540 Prospect Court. (Def.'s 56.1[1] ¶ 5.) On June 30, 1997, Opus, as landlord, executed a lease with Exel Logistics, Inc. ("Exel"), as tenant, for the 2580 Prospect Court property, referred to here as the "Kellogg Property."[2] (Id. ¶ 6; Kellogg Lease, Ex. 4 to Def.'s 56.1.) The

---

[1]     Defendant's Statement of Undisputed Material Facts.

[2]     The parties refer to the 2580 Prospect Court property and the warehouse on that property as the "Kellogg Facility." Mark Kurelac, currently a Warehouse Manager for Space Center Distribution, Inc., an affiliate of Plaintiff, and former General Manager of that facility for Exel, explains that the Kellogg Company was once Exel's subtenant. (Def.'s 56.1 ¶ 6; Kurelac Aff. ¶ 4.)



Lease required Defendant to undertake certain "Improvements" to the property, including construction of a 550,000 square foot warehouse. (Kellogg Lease § 2.1; Ex. B to Kellogg Lease.)[3] On August 28, 1997, Defendant and Exel entered into a lease ("Clorox Lease") for the 2540 Prospect Court property. (Def.'s 56.1 ¶ 7; Clorox Lease, Ex. 12 to Def.'s 56.1.) The Clorox Lease required Defendant to undertake certain "Improvements" to the property, including construction of a 350,000 square foot warehouse (together with the property, the "Clorox Facility"). (Clorox Lease § 2.1; Ex. B to Clorox Lease.)[4] Both the Kellogg Lease and the Clorox Lease (collectively, the "Leases") require the floors in the warehouse and truck dock area to be constructed of six-inch unreinforced concrete slabs, and the office area floor to consist of four-inch unreinforced concrete slabs. (Ex. B to Leases, at 2, 4.) The terms of the Leases that are relevant to this motion are identical. The commencement date of each Lease ("Lease Commencement Date") was the date on which the City of Aurora (the "City") issued a certificate of occupancy permitting Exel to occupy each Facility. (Leases, Ex. 4 to Def.'s 56.1 §§ 1.1, 2.2(b).)[5]

## II.    Purchase Agreements

On November 8, 1997, the parties to this case entered into an agreement for the sale of the Kellogg Facility and the assignment of the Kellogg Lease from Defendant to Plaintiff ("Kellogg

_____

[3]    There is no document in the Kellogg Lease labeled "Exhibit B." A list of specifications, dated June 20, 1997, does appear, without an exhibit label, among the exhibits. The court will not question the parties' apparent determination that this list is in fact "Exhibit B."

[4]    The record does not indicate whether or when Clorox owned or leased the property or warehouse located at 2540 Prospect Court, the parties refer to this property as the "Clorox Facility."
Again, no "Exhibit B" appears in the exhibits, but the parties refer to a July 8, 1997 list of specifications as such.

[5]    Section 1.1 provides in relevant part, "The term of this Lease shall commence on the date of Substantial Completion of the Landlord's Improvements as defined in Section 2.2 ('Commencement Date')." Section 2.2(b) defines "date of Substantial Completion" as "the date that the municipality having jurisdiction thereof issues a certificate of occupancy permitting Tenant to occupy and use the Landlord's Improvements."

2

Purchase Agreement"). (Def.'s 56.1 ¶ 9.) On the same day, the parties entered into an agreement for the sale of the Clorox Facility and the assignment of the Clorox Lease to Plaintiff ("Clorox Purchase Agreement"). (*Id.* ¶ 10.) The provisions of the Kellogg Purchase Agreement and the Clorox Purchase Agreement (collectively, the "Purchase Agreements") relevant to this motion are materially the same. (*See* Purchase Agreements §§ 1, 5, 7, 16, 19, 21 23; Ex. I to Purchase Agreements.)[6] In each Agreement, Defendant represents and warrants that, "[s]ubject to any latent defects and except as disclosed by any engineering reports received by [Plaintiff] with respect to the Real Property, the major structural, mechanical and electrical systems included among the Improvements are in good working order and condition to perform the work or function for which they are intended." (Purchase Agreements § 5(a)(vi).) "Improvements" are defined as "all building structures, improvements and fixtures owned by [Defendant], or in which [Defendant] has an interest, and are located on the Land, including, without limitation," the warehouse/distribution buildings. (*Id.* § 1(a).) The parties agree that the concrete floors in the Facilities are part of the structural system and, presumably therefore, are covered by the representations and warranties language in § 5(a)(vi). (Pl.'s 56.1[7] ¶¶ 45, 55; Def.'s Resp. 56.1[8] ¶¶ 45, 55.)

Defendant also represents and warrants that, except for its ongoing maintenance responsibilities under the Lease and except for "Punch List Items," "all alterations, installations, decorations and other work required to be performed by [Defendant], as lessor, under the provisions of the Lease have been completed, or will be completed on or before the Closing Date." (Purchase Agreements § 5(a)(viii)(F).) "Punch List Items" are defined as items related to the initial

---

[6]     The only differences between the relevant provisions of the two agreements are references to the sizes and prices of the two buildings. (Purchase Agreements §§ 1(a), 2.)

[7]     Plaintiff's Response to Defendant's Statement of Undisputed Material Facts and Statement of Additional Facts.

[8]     Defendant's Response to Plaintiff's Statement of Undisputed Facts and Supplemental Statement of Undisputed Material Facts and Supplemental Appendix.

construction of the Improvements which may be required to be completed under (1) "any applicable temporary or permanent certificate of occupancy, or any similar instrument issued by a governmental or quasi-governmental authority in order to permit occupancy of the Improvements," or (2) the Lease (excluding items that affect commencement of the Lease term). (Ex. I to Purchase Agreements.) The Agreement requires Defendant to complete all Punch List Items. (*Id.*)

Any cause of action for breach of the warranties and representations contained in the Purchase Agreements that is not brought within one year of the Closing Date expires, subject to § 5(c) of the Agreements. (*Id.* § 7.)[9] Under § 5(c), if Defendant becomes aware between the date of the Agreement and the Closing Date that any of its representations and warranties set forth in § 5(a)(vi)[10] of the Agreement are "no longer true and correct because of events occurring between the date of this Agreement and the Closing Date ('Particular Warranty Events'), [Defendant] shall promptly notify [Plaintiff] thereof in writing." Within ten days after such written notice, Defendant must "use its best efforts to cure" the problems. If, after reasonable efforts within the ten-day period, Defendant is unable to cure the problems, Plaintiff can "elect either (i) to terminate this Agreement . . . or (ii) to waive any such incorrect representations and warranties of [Defendant], and to proceed hereunder." In either event, "if the Particular Warranty Events are not the result of any affirmative acts, omissions, negligence or willful misconduct of [Defendant], then [Defendant] shall be automatically released from any and all liability with respect thereto." However, if such Particular Warranty Events are the result of "affirmative acts, omissions, negligence or willful

_____

[9]        Section 7 provides that, subject to § 5(c), the parties' representations and warranties contained in the Agreement survive closing, with two exceptions: (1) "any cause of action that either party may have against the other party by reason of a breach or default of any [of] the other's representations and warranties set forth herein" automatically expires one year after the Closing Date ("Warranty Expiration Date"), unless one party initiates litigation against the other party regarding any such breach or default prior to the Warranty Expiration Date; and (2) "each party's total liability for any breach or breaches of its representations and warranties set forth herein shall in no event exceed the Purchase Price."

[10]        As well as certain other sections not relevant to this litigation.

misconduct of [Defendant]," then Plaintiff is entitled to recover damages, limited to (1) certain tax

benefits Plaintiff would have obtained had it elected a like-kind property exchange with a third party

pursuant to § 16(b) of the Agreement, (2) costs and expenses Plaintiff incurred in preparation for

the consummation of the transaction (including fees paid to consultants in connection with Plaintiff's

due diligence efforts and attorneys' fees and costs), and (3) other direct damages, not including

indirect, consequential, special, or punitive damages.[11]

> In addition, the Agreement contains an integration and no-oral-modification clause:

> This agreement constitutes the entire agreement between the parties with respect
> to the subject matter herein contained. All prior negotiations, discussions, writings
> and agreements between the parties with respect to the subject matter herein
> contained are superseded and of no further force and effect. No covenant, term or
> condition of this Agreement shall be deemed to have been waived by either party,
> unless such waiver is in writing signed by the party charged with such waiver.

(*Id.* § 19.) Illinois law governs the Agreement. (*Id.* § 21.) The Agreement includes an "As Is"

clause providing that, except as set forth in the Agreement and in Defendant's Closing Documents,

Defendant has made no representations or warranties and Plaintiff is acquiring the Facility "in its

'as-is' condition with all faults." (*Id.* § 23.)

## III.  Kellogg Facility Concrete Floors

According to Plaintiff, Defendant breached § 5(c) of the Kellogg Purchase Agreement in that

it allegedly failed to notify Plaintiff in writing that the representation and warranty contained in §

5(a)(vi) was untrue. (Pl.'s 56.1 ¶ 46.) Plaintiff contends that, contrary to Defendant's

representation and warranty contained in § 5(a)(vi) of the Agreement, as of November 8, 1997, the

date the Agreement was executed, the Kellogg Facility concrete floors were "not in good working

order and condition to perform the work or function for which they were intended." (*Id.*) To support

---

[11]    Section 5(c) does not explicitly state what remedies, if any, Plaintiff has in the event
Defendant becomes aware of such Particular Warranty Events prior to the Closing Date but fails
to disclose them to Plaintiff. As discussed below, however, the court concludes that in such a
circumstance Defendant may be liable for the damages prescribed in § 5(c).

this contention, Plaintiff notes that, as of that date, Defendant had not completed the concrete floors. (*Id.*) Defendant acknowledges that it had not completed the warehouse concrete floors as of November 8, 1997, but denies that it breached §§ 5(a)(vi) and 5(c) of the Agreement because, according to Defendant, (1) Plaintiff "was well aware that construction was not complete at the time of the execution of the Kellogg Sales Agreement," (2) the concrete floors had been completed and were in good working order at the time of the Kellogg Lease Commencement Date,[12] and (3) Plaintiff "made no claim as to any breach of the Kellogg Sales Agreement within the time provided in" § 7.[13] (Def.'s Resp. 56.1 ¶ 46.)

In a December 1, 1997 Progress Report addressed to Keith Coleman ("Coleman"), a Construction Manager for Exel, James Caesar ("Caesar"), a Construction Project Manager for Defendant, estimated that the warehouse slab floor was 85 percent complete. (Ex. 42 to Pl.'s 56.1; Caesar Dep., at 12, 95.) According to Caesar, Defendant began pouring the concrete for the Kellogg Facility floors during approximately the first week of November 1997 and finished pouring the floors on or around the second week of December 1997, five weeks later. (Caesar Dep., at 93-94.)

At some point after the floors were poured, Mark Kurelac (currently a Warehouse Manager for Space Center Distribution, Inc., an affiliate of Plaintiff, and former General Manager of the Kellogg Facility for Exel)[14] claims that he "discussed the need for joint filler with Mr. Caesar[, Defendant's Construction Project Manager, as] Exel needed the joint filler placed in order for the floors to be suitable for the use of its tenant, Kellogg." (Kurelac Aff. ¶ 4.) Caesar, Kurelac claims,

---

[12]    As noted below, the Kellogg Lease Commencement Date was January 6, 1998.

[13]    The court infers that Defendant contends that Plaintiff failed to initiate litigation within one year as required by § 7.

[14]    The record does not indicate when Mr. Kurelac's employment with Exel ceased or when his employment with Space Center Distribution, Inc. began.

"said placing the joint filler soon after placement of the floors might result in the joint filler failing to perform as intended." (*Id.*) Kurelac contends he "explained that it was not Exel's fault that the floors had been poured so late in the schedule and that Exel had no choice other than having the joint filler placed if Exel were to take possession and deliver the property for use by Kellogg." (*Id.*) Kurelac claims that Caesar and he agreed that Defendant "would place the joint filler and we would sort out at a later time who would be responsible for needed repairs to the joint filler." (*Id.*) Kurelac recalls that Caesar explained that "concrete floors undergo a period of drying out and shrinkage," adding that "it would be hard to tell how the floors would perform until the drying out and shrinkage process had taken place, which I understood from him would take approximately one year." (*Id.* ¶ 5.) Consistent with this explanation, Kurelac added, "I did not agree work [on the Kellogg Facility floors] was completed or the warranty period had started because consistent[] with what Mr. Caesar had told me, I felt I needed to wait until the drying out and shrinkage process had ended and I needed to see what happened regarding the joint filler work." (*Id.* ¶ 6.) As discussed below, based on Kurelac's statement, Plaintiff contends that the floors were not complete when Defendant finished pouring the concrete.

The planned closing date for the purchase and sale of the Kellogg Facility ("Kellogg Closing Date") was December 22, 1997. (Pl.'s 56.1 ¶ 9.)[15] As required by the Kellogg Purchase Agreement, on that date, Defendant executed and tendered to Plaintiff a "Construction Guaranty" ("Kellogg Construction Guaranty"). (Def.'s 56.1 ¶ 16; Ex. 69 to Def.'s 56.1.) In the Kellogg Construction Guaranty, Defendant guarantees that "the Improvements (as such term is defined in the Purchase Agreement), other than Punch List Items (as such term is defined in the Purchase

---

[15] Section 8(a) of the Purchase Agreements provides that the Closing would occur on December 19, 1997, or on another mutually-agreed date. In a November 24, 1997 document titled "Closing Notice," Defendant elected to schedule the Kellogg Closing Date on December 22, 1997, which as noted below was prior to the Kellogg Lease Commencement Date, January 6, 1998. (Pl.'s 56.1 ¶ 43; Ex. 64 to Pl.'s 56.1.)

Agreement), if any," will be free from defects for a period of one year from January 6, 1998.[16]

Defendant also guarantees that each Punch List Item will be free from defects for a period of one

year "from the date on which each such Punch List Item has been completed." The Guaranty

states, further, "In the event that any defect which is covered by the terms of this Construction

Guaranty occurs, and [Plaintiff] provides written notice thereof to [Defendant], within such one[]-

year period, [Defendant] agrees, at its sole cost and expense, to repair or replace such defective

Improvements." Finally, the Construction Guaranty provides:

> Except as expressly provided in the Purchase Agreement, performance of such
> one-year guaranty shall be [Defendant's] sole and exclusive obligation with respect
> to any defects in the Improvements (including, without limitation, the Punch List
> Items), and [Plaintiff's] rights to enforce such one-year guaranty shall be [Plaintiff's]
> sole and exclusive remedy with respect thereto, in limitation of any contract,
> warranty or other rights, whether express or implied, that [Plaintiff] may otherwise
> have under applicable law.

On January 6, 1998, the City of Aurora issued a temporary certificate of occupancy for the

Kellogg Facility, and the Kellogg Lease commenced. (Def.'s 56.1 ¶¶ 13-14; Ex. 17 to Def.'s 56.1.)

Defendant claims that, as of that date, "construction of the concrete floors was complete, and there

were no punch list items relating to the initial construction of the concrete floors." (Def.'s 56.1

¶ 15.) Defendant points to a punch list document[17] titled "Exel Logistics - Items outstanding as of

---

[16]    Specifically, Defendant guarantees that the Improvements (other than Punch List
Items), if any, will be free from defects for a period of one year from the latter of (i) the Kellogg
Lease Commencement Date or (ii) the date of the Construction Guaranty. Since, as noted below,
the Kellogg Lease Commencement Date was January 6, 1998, while the Construction Guaranty
was dated December 22, 1997, the parties implicitly agree that Defendant's guaranty that the
Improvements (other than Punch List Items) would be free from defects for one year commenced
on January 6, 1998. As discussed below, however, Plaintiff argues that the concrete floors in both
Facilities are Punch List Items and, thus, the one-year warranty period for the floors did not
commence until November 8, 1998, the day the City of Aurora issued a final certificate of
occupancy for the Kellogg Facility. (Plaintiff's Memorandum in Opposition to Motion for Partial
Summary Judgment, at 4-5.)

[17]    The court notes that the term "punch list item" is used throughout the record and in
both parties' briefs to refer both to "Punch List Items," as that term is defined in the Purchase
Agreements, and to several documents titled "Punch List" that list the scheduled and actual
(continued...)

January 14, 1998" that lists only one item relating to the construction of the concrete floors in the Kellogg Facility: concrete floor sealer, which the document indicates was completed by a subcontractor named Busy Beaver on December 31, 1997.[18] (Ex. 19 to Def.'s 56.1, at 3; Caesar Aff. ¶¶ 1, 5; Coleman Dep., at 36-37.) Coleman testified that, to his knowledge, the concrete floors in the Kellogg Facility had been completed as of January 6, 1998. (Coleman Dep., at 37.)

Plaintiff asserts that, "if the word 'complete' is intended to suggest that the floors as placed were suitable and in accordance with the applicable specifications," then construction of the floors was not complete as of January 6, 1998. (Pl.'s 56.1 ¶ 15.)[19] Plaintiff also alleges that Exel never

_____

[17](...continued)
completion dates for several items. As reflected below, Defendant apparently believes that even where such documents are labeled "Punch List," they list not only items defined as "Punch List Items" in the Purchase Agreements, but also "warranty items." To minimize confusion, this opinion uses the capitalized phrase "Punch List Item(s)" to refer to Punch List Items as defined in the Purchase Agreements, and the lower-case term "punch list document" to refer to any documents bearing the title "Punch List."

[18]    The document states that the floor sealer was completed on December 31, 1998. As this is obviously a scrivener's error, since the document is dated January 14, 1998, the court assumes the intended date was December 31, 1997.

[19]    Plaintiff also claims that, as of January 6, 1998, "significant work needed to be completed to obtain a permanent certificate of occupancy and otherwise was owed under the Kellogg Lease." (Pl.'s 56.1 ¶ 15.) It is undisputed that the City did not issue the final certificate of occupancy for the Kellogg Facility until November 9, 1998. (Ex. 44 to Pl.'s 56.1.) Plaintiff insists that the reason for the ten-month delay between issuance of the temporary and final certificates was because of "outstanding or incomplete work [Defendant] was required to complete." (Pl.'s 56.1 ¶ 13.) Plaintiff points to Caesar's testimony that the reason for delay between the temporary and final certificates was that "we had a separate Kellogg sales office build-out, which we were building directly for Kellogg, and [the City of Aurora] didn't want to give us a final [certificate of occupancy] until the entire space was built out." (Caesar Dep., at 101.) Plaintiff also notes that Kurelac stated that, after Exel took possession of the Kellogg Facility, Defendant "continued to do extensive work in and around the Kellogg facility until approximately the late spring of 1998." (Kurelac Aff. ¶¶ 3, 6.) Kurelac did not, however, indicate whether this work included the floors. Plaintiff also asserts that Defendant did not inform Plaintiff that Defendant "had completed all [of] its punch list items and spring completion items . . . until June 24, 1998." (Pl.'s 56.1 ¶ 15.) In support, Plaintiff cites a June 24, 1998 letter from Caesar to Tom Hogan, Vice President of Space Center, Inc. (the record does not indicate the relationship between Space Center, Inc. and Plaintiff, but the court assumes they are affiliated entities) stating that Defendant had completed all punch list items for the Kellogg project. (Ex. 20 to Pl.'s 56.1.) Defendant, for its part, offers no explanation for the delay between
(continued...)

9

agreed that work on the floors had been completed or that the warranty period had started. (*Id.*) To support these contentions, Plaintiff notes that Kurelac stated that he did not agree that work on the Kellogg Facility floors had been completed or that the warranty period had started because, consistent with what Caesar had told him, he felt he needed "to wait until the drying out and shrinkage process had ended and I needed to see what happened regarding the joint filler work." (Kurelac Aff. ¶ 6.)[20]

On April 17, 1998, the parties entered into a construction contract which provided that Defendant would construct a 100,000 square foot addition to the Kellogg Facility ("Kellogg Addition Contract"). (Def.'s 56.1 ¶ 34.) Defendant "substantially completed" construction of the Kellogg Addition, and the City issued a "certificate of occupancy and compliance" for the Addition on October 30, 1998. (*Id.* ¶¶ 35-36.) In the Kellogg Addition Contract, Defendant guarantees the work for a period of one year from the date of Substantial Completion. (Ex. 53 to Def.'s 56.1, art. 6.) Further, Defendant disclaims all warranties. (*Id.*)[21] It is undisputed that Plaintiff never gave Defendant notice of any claim of any defects in the parking lots of the Kellogg Addition. (Def.'s 56.1 ¶ 38.) In this lawsuit, Plaintiff claims that Defendant breached the Kellogg Addition Contract "with regard to the concrete floors and areas of the parking lots" and made misrepresentations in part to induce Defendant to enter into the Kellogg Addition Contract. (Compl. ¶¶ 38, 43.) These

_____

[19](...continued)
issuance of the temporary and final certificates. As Plaintiff does not claim that any floor work was required to be completed to obtain a final certificate, however, the court is uncertain that delay supports Plaintiff's claim that, as of January 6, 1998, construction of the floors was not complete, and there were punch list items relating to the initial construction of the concrete floors.

[20]    Plaintiff also claims that a January 23, 1998 punch list document identified several items concerning the floors, but points to no such document in the record. This unsupported factual assertion cannot create a genuine issue of material fact.

[21]    Specifically, Defendant "disclaims any, and makes no, representation, warranty or guaranty of any kind (express implied or statutory) as to merchantability, fitness for a particular purpose or any other matter with respect to the project, the work, any material or equipment, any part thereof or otherwise." (Ex. 53 to Def.'s 56.1, art. 6.)

claims are discussed below.

## IV.    Clorox Facility Concrete Floors

As with the Kellogg Facility, the parties agree that, as of November 8, 1997, the date of the Clorox Purchase Agreement, the concrete floors were not complete, but dispute whether Defendant therefore breached §§ 5(a)(vi) and 5(c) of the Agreement, making substantially similar arguments to those regarding the Kellogg Facility floors. (Pl.'s 56.1 ¶¶ 56-57; Def.'s Resp. 56.1 ¶¶ 56-57.) It is undisputed that the Clorox Lease commenced on March 30, 1998 ("Clorox Lease Commencement Date"), when the City issued a temporary certificate of occupancy for the Clorox Facility. (Pl.'s 56.1 ¶¶ 25–26; Ex. 57 to Def.'s 56.1.) The closing date for the sale of the Clorox Facility was April 15, 1998 ("Clorox Closing Date"). (Def.'s 56.1 ¶ 10.) As required by the Clorox Purchase Agreement, on that date, Defendant executed and tendered to Plaintiff a Construction Guaranty ("Clorox Construction Guaranty"). (*Id.* ¶ 28.) The provisions of the Clorox Construction Guaranty that are relevant to this motion are identical to those of the Kellogg Construction Guaranty, discussed above, except that the Clorox Construction Guaranty guarantees that the Improvements, other than Punch List Items, will be free from defects for a period of one year from April 15, 1998.[22]

Defendant claims that, as of March 30, 1998 or, at the latest, April 13, 1998,[23] initial "construction of the concrete floors was complete and there were no punch list items relating to the initial construction of the concrete floors." (Def.'s 56.1 ¶ 27; Def.'s Resp. 56.1 ¶ 73.) To support

---

[22]    As noted earlier, Defendant guarantees that the Improvements (other than the Punch List Items), if any, will be free from defects for a period of one year from the latter of (i) the Lease Commencement Date or (ii) the date of the Construction Guaranty. Since the Clorox Lease Commencement Date was March 30, 1998, while the Clorox Construction Guaranty was dated April 15, 1998, it is undisputed that the applicable one-year period for the Clorox Construction Guaranty commenced on April 15, 1998.

[23]    The date Defendant stated was April 13, 1999. However, as Defendant cites an April 13, 1998 punch list document, the court presumes that the 1999 date is the result of a scrivener's error.

these assertions, Defendant cites an April 13, 1998 punch list document of items related to the initial construction of the Clorox Facility which were incomplete as of March 30, 1998; Coleman (of Exel) and Bradley Flaugher ("Flaugher"), who served as Defendant's Construction Project Manager for the Clorox Facility, note that this punch list document includes no items related to construction of the concrete floors. (Ex. 25 to Def.'s 56.1; Coleman Dep., at 51; Flaugher Aff. ¶¶ 2, 5.)[24]  In response to the question, "Ignoring the Certificate of Occupancy, do the status reports and the time line and the April 13 punch list lead you to conclude that the floors were complete by April 13, in any event?" Coleman stated, "I would say they were complete." (Coleman Dep., at 56-57.) Coleman implied, however, that he did not know whether Exel, his employer, had "accepted" the floors.[25] (Id. at 57.)  Defendant also notes that the first punch list document to identify any problems with the floors was a June 10, 1998 punch list document, prepared by Flaugher, noting that repair of "[c]oncrete curling at joints in aisles of warehouse"[26] had a "scheduled completion" date of June 17, 1998. (Exs. 36, 82 to Pl.'s 56.1, at 4.)[27]  In response to the question whether

---

[24]     Flaugher states in his affidavit that this document is "a punch list . . . listing items related to the initial construction of the Clorox facility which were not completed as of the issuance of the Temporary Certificate of Occupancy on March 30, 1998." (Flaugher Aff. ¶ 5.) Although the document itself does not indicate whether these items were incomplete as of March 30 or as of April 13, Plaintiff has not contested Flaugher's assertion that the items were incomplete as of March 30.

[25]     Coleman stated, "Whether [the floors] . . . had been accepted–Opus does not have a tenant acceptance letter that they require their tenants to sign?" to which Defendant's counsel responded "Again, I have not seen one," and Coleman replied, "Okay. I was just asking because that's what we typically do." (Coleman Dep., at 57.) Coleman did not explain what he meant by the term "accepted."

[26]     Coleman testified that this item referred to the fact that "[t]he sawcut joints were spalling and there was severe slab curl." (Coleman Dep., at 65.) The term "to spall" means "to break off chips, scales, or slabs." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 1126 (10th ed.1997).

[27]     The June 11, 1998 fax cover page for this punch list document included a handwritten note from Flaugher to Coleman and Bob Warda of Exel (the record does not identify his title) stating that "we will schedule a meeting with you, Bob, to discuss which joints will be
(continued...)

concrete curling had been a problem before June 10, 1998, Coleman stated, "No, because we'd probably just gotten on starting to use the floor[s] for [their] intended use sometime between . . . the last May 28[] punch list" and June 10. (Coleman Dep., at 64-65.)[28] Although Defendant never bothers to identify in its submissions when the concrete for the Clorox Facility floors was poured, the record contains several status reports that Flaugher faxed to Coleman, Dale Bailey ("Bailey"), Ken Parker and Kevin Tarpley of Exel[29] indicating that the warehouse "shell building" had been "completely enclosed" and heating of the building had begun by February 3, 1998, that concrete pouring for the floors began on February 4, 1998, and that concrete pouring was completed on March 5, 1998. (Exs. 27-30 to Def.'s 56.1.)

Plaintiff claims that Defendant was aware that Exel had concerns about the Clorox Facility's concrete floors since at least May 1998, through Exel's written and oral communications requesting that Defendant repair problems or defects in the floors, and that, in April 1999, both Exel and Plaintiff orally advised Defendant of problems or defects in the floors. (Pl.'s 56.1 ¶¶ 33, 64.)[30] To support these contentions, Plaintiff points to Bailey's handwritten document titled "Clorox Building Punch List Items" that Bailey faxed to Flaugher on May 14, 1998. (Ex. 34 to Pl.'s 56.1.) One of the items listed is "Cement floor in N aisle is sinking," which, according to Coleman, referred to

---

[27](...continued)
ground in the traffic aisles where the joint curling has occurred." (Exs. 36, 82 to Pl.'s 56.1, at 1.)

[28]     Coleman actually stated that Exel had likely begun to use the floors for their intended use "between June 11th and the last May 28th punch list," (Coleman Dep., at 64-65), but based on the fact that the floors were included on the June 10, 1998 punch list document, the court infers that this initial use of the floors was on or before that date.

[29]     The record does not identify the titles of Messrs. Bailey, Parker, or Tarpley.

[30]     Plaintiff contends that Defendant's awareness of the floor problems in the Clorox Facility constituted "actual knowledge" that operated as a waiver of the one-year warranty periods. (Plaintiff's Memorandum in Opposition to Motion for Partial Summary Judgment, at 11.)  As discussed in note 58, the court need not determine whether a genuine dispute exists regarding whether Defendant waived the warranty periods, as there is a genuine issue regarding whether the notice periods are applicable to Plaintiff's claims regarding the floors.

cracking and a change in elevation in one section of the floors. (*Id.*; Coleman Dep., at 101.) Defendant notes that Flaugher wrote "leave out" on the Bailey document next to the item "[c]ement floor in N aisle is sinking" so the item would not be added to the punch list document, assertedly because this floor section was not in fact sinking. (Ex. 81 to Def.'s Resp. 56.1, at 4; Flaugher Dep., at 127-29; Ex. 34 to Pl.'s 56.1.) There is no evidence in the record, however, that Exel accepted Flaugher's assertion that this floor section was not in fact sinking, nor does Flaugher's own determination that a reference to the floor sinking should be "left out" establish, as Defendant asserts, that the defect was never made a part of a punch list document.

Plaintiff insists that Exel "never accepted the concrete floors because it did not ever believe the floors had been fixed or were in good condition." (Pl.'s 56.1 ¶ 27.) To support this contention, Plaintiff notes that, although Coleman testified that he believed the floors were complete as of April 13, 1998, he implied that he did not know whether Exel, his employer, had "accepted" the floors. (Coleman Dep., at 56-57.) Plaintiff also cites an internal Exel document–a bullet point list titled "Clorox - Chicago" faxed on September 2, 1999 from William Shelby of Exel[31] to Coleman–that lists "Concrete floors are spalling at saw joints." (Ex. 39 to Pl.'s 56.1, at 1.) In addition, Plaintiff points out that Flaugher's June 10, 1998 and November 3, 1998 punch list documents both identify concrete curling at aisle joints in the warehouse floor as a problem that had an "actual completion" date of August 12, 1998. (*Id.*; Exs. 36, 37, 82 to Pl.'s 56.1.) Plaintiff also cites a document titled "Opus North Warehouse Facilities"[32] indicating that the Clorox Facility required "repair or maintenance of the concrete floors," specifically, "[g]rinding of Const. Joint," and that the cost of such repair would be $2,000. (Ex. 41, at 1.)[33]

---

[31]  The record does not identify Mr. Shelby's position.

[32]  The record does not indicate by or for whom, or when, this document was written.

[33]  Plaintiff also cites the deposition of Charles Arend of Plaintiff (the record does not
(continued...)

Plaintiff also claims that, in March 1998, Exel informed Defendant that it was concerned the concrete floors "would experience excessive slab curling because [Defendant] poured the floors after closing and heating the Clorox facility." (Pl.'s 56.1 ¶ 27.) Plaintiff cites Coleman's testimony that he wrote a memo on May 17, 1999 indicating that curling was "still an item." (Coleman Dep., at 69.) Coleman observed that he had been concerned about Defendant's wintertime construction–specifically, Defendant's building the roof and walls and heating the building prior to pouring the concrete floors, thereby trapping moisture in the building.[34] (Id., at 47.) He stated that Defendant had attempted to raise the building temperature to avoid having to protect the poured concrete with blankets. (Id.) (Although the record does not make this clear, the court presumes Coleman believes the use of blankets was a requirement of good floor construction during cold weather.) Coleman claimed that he had been concerned about heating or blowing air movement

---

[33](...continued)
identify Mr. Arend's title), in which he testified that "[t]he requirement was that a completed properly designed concrete floor slab was installed, and I don't believe that that was in place on the date of this document." (Arend Dep., at 42.) The portion of the deposition provided by Plaintiff does not provide any information regarding the document to which Arend was referring, and this court will not consider as evidence testimony that has been taken out of context.

As with the Kellogg Facility, Plaintiff claims that, "if the word 'complete' is intended to suggest that the floors as placed were suitable and in accordance with the applicable specifications," then construction of the concrete floors was not complete as of March 30, 1998. (Pl.'s 56.1 ¶ 27.) It is undisputed that the City did not issue the final certificate of occupancy for the Clorox Facility until March 3, 1999. (Ex. 24 to Pl.'s 56.1.) Plaintiff claims this eleven-month delay was "due to outstanding or incomplete work [Defendant] was required to complete after the Temporary Certificate of Occupancy was issued." (Pl.'s 56.1 ¶ 25.) Plaintiff adds that "significant work needed to be completed to obtain a permanent certificate of occupancy and otherwise was owed under the Clorox Lease," although Plaintiff does not mention whether such work included the floors. (Id. ¶ 27.) Plaintiff offers no support for these contentions, despite the fact that it cites the Caesar deposition as evidence explaining the delay between issuance of the temporary and final certificates for the Kellogg Facility. (Id. ¶ 13.) As with the Kellogg Facility, Defendant offers no explanation for this delay between issuance of the temporary and final certificates. As neither party has bothered to offer evidence to explain the eleven-month delay, the court is unable to determine whether that delay was a product of concern about the completeness of the floors.

[34]     As noted earlier, the record contains several status reports indicating that the warehouse "shell building" had been "completely enclosed" and heating of the building had begun by February 3, 1998, that concrete pouring for the floors began on February 4, 1998, and that concrete pouring was completed on March 5, 1998. (Exs. 27-30 to Def.'s 56.1.)

across the surface of the poured concrete slab because he believes those factors induce slab curling. (*Id.* at 48.) He stated that he shared his concerns regarding concrete curling with Flaugher, although he could not recall when he first expressed these concerns and did not remember how Flaugher responded. (*Id.* at 48, 64.) The court is uncertain that Plaintiff's contention that the floors were not poured or heated *properly* also means that the floors had not been *completed* as of March 30, 1998.

Further, Plaintiff alleges that the floors "were never repaired to Exel's satisfaction." (Pl.'s 56.1 ¶ 27.) To support this contention, Plaintiff again cites Coleman's deposition, in which he stated that he did not believe the floors were ever "repaired to satisfaction" and that it was his judgment that "the floors were not correct from the first day . . . that there was traffic on the floor," which was sometime between May 28 and June 10, 1998. (Coleman Dep., at 64-65, 74, 86.) Coleman indicated that he had noticed the curling at that time and that, during forklift traffic, he could "hear the slabs rocking which indicates curling." (*Id.* at 98.) He also stated that "[w]e saw areas in a very short period of time that had started to spall which . . . in my opinion is because of curling." (*Id.*) He also claimed that at this time he had begun to notice floor joint deterioration which, in his opinion, was caused by the floor slab curling. (*Id.*) He added that there had been visible signs of curling prior to June 10, 1998. (*Id.*) In response to the question, "was there ever a time that you expressed to . . . anyone from [Defendant] that you were satisfied with the work that they had done to purportedly correct the problems?" Coleman stated, "No, I don't believe so. . . . as far as I know the slab still isn't probably fixed to where I would give a clean bill of health on it." (Coleman Dep., at 98.) Again, Plaintiff does not explain how its contention that the floors were not *repaired* properly demonstrates that the floors had not been *completed* as of March 30, 1998.

Plaintiff also notes that Coleman was asked at his deposition whether he recalled "prior to . . . 1999 . . . anybody from [Defendant] ever indicating to you that not putting the joint filler in would be detrimental to the performance of the [Clorox Facility] concrete floor?" Coleman had no such

memory. (*Id.* at 98-99.) The parties implicitly agree that Defendant never used joint filler for the

Clorox Facility floors, nor is there any evidence that Defendant ever advised Exel to use joint filler

for those floors.[35] As Plaintiff does not claim that Defendant breached any representations or

warranties by failing to apply joint filler in the Clorox Facility, however, the court presumes

Defendant did not make the decision not to use joint filler. (*See* Pl.'s 56.1 ¶ 39.) The court

believes this matter relates to whether Defendant followed good construction methods in laying the

floors, which is a warranty issue unrelated to when the floors were completed.

Defendant acknowledges that Exel made some warranty claims relating to the floors in June

1998 but claims that Defendant addressed these claims by making the necessary repairs. (Def.'s

Resp. 56.1 ¶ 65.) Defendant claims further that "[t]he first problem that Exel noted regarding the

concrete floors in the Clorox facility was referenced on a punch list dated June 10, 199[8]."[36] (*Id.*

¶ 74.) In support, Defendant cites Flaugher's testimony that, in response to Flaugher's June 10,

1998 document listing "[c]oncrete curling at joints in aisles of warehouse" with a "scheduled

completion" date of June 17, 1998, (Exs. 36, 82 to Pl.'s 56.1, at 4), Defendant sent subcontractor

Busy Beaver to repair the locations where the joint curling had occurred. (Flaugher Dep., at 131-

34.)[37] Defendant also notes that Coleman testified that Exel had not noticed the concrete curling

prior to May 28, 1998. (Ex. 36 to Pl.'s 56.1, at 4; Coleman Dep., at 64-65.) Although Flaugher

testified that he would classify the "[c]oncrete curling at joints in aisles of warehouse" item as a

---

[35]     As noted earlier, Kurelac claims that Caesar and he agreed that Defendant would
place the joint filler in the Kellogg Facility, "and we would sort out at a later time who would be
responsible for needed repairs to the joint filler." (Kurleac Aff. ¶ 4.)

[36]     The date Defendant states is June 10, 1999. However, as Defendant cites the June
10, 1998 punch list document indicating that concrete floors were a problem, the court presumes
that the 1999 date is a typographical error.

[37]     Flaugher claimed that Bob Warda of Exel (the record does not identify his title)
agreed with him that the work had been completed, (Flaugher Dep., at 137), but no affidavit or
deposition from Mr. Warda is in the record.

warranty issue, (Flaugher Dep., at 136), the record does not indicate whether Plaintiff or Exel believed it was.

According to Defendant, items relating to defects in the Clorox Facility that were noted on punch list documents and at initial occupancy were "warranty items," rather than "Punch List Items" as defined in the Purchase Agreements. (Def.'s Resp. 56.1 ¶¶ 66, 68, 75.) The fact that a witness may have referred to matters relating to the floor on a document labeled "punch list" is, according to Defendant, immaterial. Defendant notes that Coleman uses the term "punch list item" to refer to "an item that I go out and look and I make a note of it that it needs to be corrected prior to taking occupancy of the building." (Coleman Dep., at 61-62.) He agreed that, once an item is completed, it is taken off of the punch list document, and "if it fails at sometime within whatever the warranty period is, it would be a warranty claim." (*Id.* at 62.) Similarly, Flaugher offered the following explanation:

> Punch list is a list of the items that had to be completed that we did an initial walk through on the job, but also it sort of [was] more of a to-do list, I want to say, as this went on because we added items to this list that were more than what was just the initial punch list, there w[ere] also some warranty items . . . added to it. So even though I call it a punch list, it was just a general to-do list.

(Flaugher Dep., at 118.) Flaugher added that this was his understanding at the time he wrote, "Here is an updated copy of the punch list" on the fax cover page to the April 13, 1998 document. (*Id.*; Ex. 32 to Pl.'s 56.1.)[38] Flaugher testified that Defendant used the term "punch list" to refer to a list of "items that were incomplete as of [Plaintiff's] occupancy," while a warranty list was a list of "items that were defective somehow after [Plaintiff's] occupancy" and that Defendant did not distinguish on the punch list document between Punch List Items (as defined in the Purchase Agreements) and warranty items. (Flaugher Dep., at 130.) As noted earlier, Flaugher also stated

---

[38]      Defendant does not indicate whether it believes that Exel (or Plaintiff) was required at that time to make a claim concerning the floors under the warranty provisions of the Clorox Purchase Agreement or Construction Guaranty.

that he would classify the "[c]oncrete curling at joints in aisles of warehouse" item as a warranty issue. (*Id.* at 136.)

## V. April 1999 Walk-Through/Meeting

The parties agree that the first time they met to discuss problems with the floors was an April 1999 meeting[39] during which Coleman of Exel, Charles Arend ("Arend") of Plaintiff,[40] Flaugher of Defendant, and perhaps others determined that the concrete floors in the Facilities were "spalling at saw joints and the blacktop was found to be spider webbing at the front drive-in dock, exit gate, and a number of the truck dock doors."[41] (Pl.'s 56.1 ¶ 69.) Plaintiff claims it did not discover these "problems and defects with the floors" until this walk-through. (*Id.*) In addition to looking at the spalling of the joints in the Clorox Facility dock area, Flaugher stated, the attendees looked at the deterioration of the joints and "the cracks off of the dock levels." (Flaugher Dep., at 145.) Flaugher also claimed that he told Arend at the meeting that he felt that the spalling was caused by the lack of joint filler, implying that either Plaintiff or Exel had made the decision not to use joint filler in the Clorox Facility.[42]

---

[39]    The record does not indicate the precise date of this meeting.

[40]    The record does not identify Mr. Arend's title.

[41]    According to Coleman, "spider webbing" refers to breaking up or cracking of the blacktop, allowing water penetration and eventually leading to deterioration of the black top and the subgrade below it. (Coleman Dep., at 91.)

[42]    Flaugher's implication is consistent with the fact that Plaintiff does not claim that Defendant breached any representations or warranties by failing to apply joint filler in the Clorox Facility, which fact also implies that Defendant did not make the decision not to use joint filler. (*See* Pl.'s 56.1 ¶ 39.)
Plaintiff also cites an April 27, 1999 memo that Arend wrote to Mike Miles and the "Tuesday Group" following his "walk-through" of the Facilities in April 1999. (Arend Dep., at 113-14.) The record provides no details regarding Mike Miles or the "Tuesday Group," and Defendant claims it never received this memo. (Def.'s Resp. 56.1 ¶ 69.) The memo states that in the Kellogg Facility, "some concrete slabs have curled and are 'loose.' When forklifts roll over saw-cuts, the adjacent slabs move slightly up and down." (Ex. 78 to Pl.'s 56.1, at 3.) The memo adds that this problem was more pronounced in the Clorox Facility and notes that the saw-cuts had been caulked in the
(continued...)

## VI. Correspondence Regarding Problems and Defects

On May 3, 1999, for the first time, Plaintiff gave Defendant written notice that there were defects in the concrete floors in the Facilities, through a letter from Mike Urbanos ("Urbanos") of Space Center, Inc.[43] to Caesar. (Def.'s 56.1 ¶ 21.) The letter purported to serve "as formal notice of defects" in both Facilities pursuant to the terms of the Kellogg Construction Guaranty and the Clorox Construction Guaranty (collectively, the "Construction Guaranties"). (Ex. 56 to Pl.'s 56.1.) The letter claimed that Plaintiff had "discovered certain latent defects in the concrete slabs and floors in both . . . properties." (Id.) It further asserted that "[t]here is serious cracking and settling of the concrete slabs which are causing significant problems in the tenant's use of the premises," and stated that additional floor problems might exist. (Id.)

In a May 17, 1999 letter to Flaugher, Coleman stated that Exel had performed its "one-year inspection" of the Clorox Facility and found ten items to be deficient and in need of repair "as soon as possible." (Ex. 16 to Pl.'s 56.1.) One of the items listed was "[c]oncrete floors . . . spalling at saw joints." (Id.) The parties agree that Defendant conducted an investigation in response to Plaintiff's and Exel's oral and written notices to Defendant concerning the problems with and defects in the floors in the Facilities. (Pl.'s 56.1 ¶ 70.) As part of this investigation, Allen Face ("Face"), a concrete floor and pavement technology specialist, submitted a June 4, 1999 report to Defendant regarding recommended slab rocking and joint repair procedures for the Clorox Facility.

---

[42](...continued)
Kellogg Facility but not in the Clorox Facility. (Id.) With regard to the Clorox Facility, the memo states that, because many of the concrete slabs were loose, forklift loads bounced when they traveled over the joints, "partially because the slabs curl up, and partially because the slabs move up and down." (Id.) The memo notes that Defendant "is accepting some responsibility, but has suggested that the fact that the saw-cuts were not caulked is contributing to the problem." (Id.) The record does not indicate which party was responsible to caulk the saw-cuts. The court notes that, in any event, it need not determine what the defects in the floors were or who was responsible for addressing such problems in order to resolve whether Plaintiff provided written notice of problems with the floors to Defendant within one year after the floors were completed.

[43]     The record does not identify Mr. Urbanos's position.

20

(*Id.*; Ex. 38 to Pl.'s 56.1.)  There were also several communications among the parties and Exel regarding the concrete floors, the extent and cause of the problems observed, and possible remediation.  (Def.'s 56.1 ¶ 71; Exs. 62, 68 to Pl.'s 56.1.)

It is undisputed that, before February 7, 2000, Defendant never expressed any concern regarding the timeliness of Plaintiff's notice of the problems and defects with the floors in the Facilities.  (Pl.'s 56.1 ¶ 72; Def.'s Resp. 56.1 ¶ 72; Ex. 63 to Pl.'s 56.1.)  In a letter of that date from Craig Conety, Vice President of Construction for Defendant, to Mark Martin, President of Space Center Kansas City, Inc.,[44] Defendant asserted for the first time that Plaintiff's written notice did not come within the one-year warranty period of the Construction Guaranties.  (Pl.'s 56.1 ¶ 72; Ex. 63 to Pl.'s 56.1.)  Defendant claims that, prior to this letter, it had verbally expressed its belief that, while it was not responsible for any of the problems Exel was experiencing with the floors, it was willing to perform the work outside of its contractual obligations in order to resolve the dispute. Defendant offers no evidentiary support for this contention, however.  (Def.'s Resp. 56.1 ¶ 72.)

## VII.    Complaint

Plaintiff filed the Complaint in this matter on November 2, 2001.  In Count I of its Complaint (Breach of Contract and Warranty), Plaintiff claims it has performed "all conditions precedent" under both Purchase Agreements and the Kellogg Addition Contract.  (Compl. ¶ 37.)  Plaintiff contends that Defendant breached these agreements "with regard to the concrete floors and areas of the parking lots" of both Facilities and of the Kellogg Addition.  (*Id.* ¶ 38.)  As a result of the alleged breaches, Plaintiff asserts, it has suffered assessment costs, loss of the use of the concrete floors, and diminution in the value of its property; will suffer such loss of use, as well as repair costs, in the future; and has incurred "other damages" to be calculated at trial but which it expects will exceed $4 million.  (*Id.* ¶ 39.)  Although Defendant has not addressed these claimed

---

[44]    The record does not indicate the relationship between Space Center Kansas City, Inc. and Plaintiff.

damages, the court notes that Plaintiff's damages are limited under the Construction Guaranties to repair and replacement of the defective Improvements, and under § 5(c) of the Purchase Agreements to (1) certain tax benefits, (2) costs and expenses incurred in preparation for the transaction, and (3) other direct damages, not including indirect, consequential, special, or punitive damages.

In Count II (Misrepresentation), Plaintiff contends that Defendant made misrepresentations of material facts concerning the concrete floors and areas of the parking lots of the Facilities about which Defendant had knowledge or belief, or reasonably should have known. (*Id.* ¶¶ 41-42.) Plaintiff claims Defendant made these misrepresentations to induce Defendant to enter into the Purchase Agreements and the Kellogg Addition Contract and to close on the Purchase Agreements, as well as "to delay, prevent, or frustrate assertion of" Plaintiff's claims against Defendant. (*Id.* ¶ 43.) Plaintiff assertedly relied upon these alleged misrepresentations and reiterates the damages claimed in ¶ 39 of the Complaint. (*Id.* ¶¶ 44-45.)

## DISCUSSION

Defendant seeks summary judgment in its favor with regard to all of Plaintiff's claims except those relating to the concrete floors in the Kellogg Addition. (Def.'s Motion,[45] at 3; Def.'s Mem.,[46] at 9.)[47] Plaintiff responds that summary judgment is inappropriate as "[t]his case involves the

---

[45]     Defendants' Motion for Partial Summary Judgment.

[46]     Defendant's Memorandum in Support of its Motion for Partial Summary Judgment.

[47]     Oddly, Defendant does not seek summary judgment as to Plaintiff's breach of contract and warranty claims regarding the parking lots of the Clorox Facility. (Def.'s Motion, at 3.) In its brief, Defendant implicitly concedes that there may have been "Punch List Items" relating to the Clorox Facility parking lots as of May 3, 1998, as it acknowledges that Plaintiff "may arguably have made a claim with respect to the parking lots of the Clorox facility within one year of their completion as Punch List Items." (Def.'s Mem., at 9.) Nor does Defendant seek summary judgment as to Plaintiff's claims relating to the concrete floors in the Kellogg Addition, stating that "it is ambiguous whether [Plaintiff's] May 3, 1999 notice of defects in the concrete floors referred to the Kellogg Addition." (*Id.*)

complex interrelationship between two purchase agreements, two leases, a host of written and oral representations, and the conflicting testimony of numerous fact and expert witnesses." (Pl.'s Mem.,[48] at 2.)

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(C). The court must construe the record in the light most favorable to the nonmoving party, and may grant summary judgment only if no reasonable jury could return a verdict for the nonmoving party. *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). The non-moving party bears the burden to point to specific facts in the record that demonstrate that there is a genuine issue for trial. *Morfin v. City of East Chicago*, 349 F.3d 989, 997 (7th Cir. 2003). Summary judgment is particularly appropriate where issues of interpretation of the terms of an unambiguous contract are at stake. *Kallman v. Radioshack Corp.*, 315 F.3d 731, 735 (7th Cir. 2002) (citations omitted).

The court first considers whether the one-year limitation in the Construction Guaranties bars Plaintiff's claims regarding the Facilities' concrete floors as a matter of law. Then, the court discusses whether Plaintiff can recover for such claims under the Purchase Agreements. Finally, the court briefly addresses Plaintiff's claims regarding the parking lots of the Facilities and the Kellogg Addition.

## I.    Can Plaintiff Recover Under the Construction Guaranties?

In the Construction Guaranty for each Facility, discussed above, Defendant guarantees that the Improvements, other than Punch List Items as that term is defined in each Purchase Agreement, will be free from defects for a period of one year from the Commencement Date of the

---

[48]    Plaintiff's Memorandum in Opposition to Motion for Partial Summary Judgment.

Construction Guaranty—January 6, 1998 for the Kellogg Facility and April 15, 1998 for the Clorox Facility. Defendant guarantees that each Punch List Item will be free from defects for a period of one year from the date on which such item is completed. If Plaintiff provides written notice to Defendant of any defects that are covered by the terms of the Construction Guaranty within such one-year period, Defendant is required to repair or replace such defects at Defendant's sole expense. The Construction Guaranty further provides that, except as expressly provided in the Purchase Agreement, "performance of such one[]-year guaranty shall be [Defendant's] sole and exclusive obligation with respect to any defects in the Improvements (including, without limitation, the Punch List Items), and [Plaintiff's] rights to enforce such one-[]year guaranty shall be [Plaintiff's] sole and exclusive remedy with respect thereto, in limitation of any contract, warranty or other rights, whether express or implied, that [Plaintiff] may otherwise have under applicable law."

## A.    Applicability of One-Year Limitation Period

As noted earlier, on May 3, 1999, for the first time, Plaintiff gave Defendant written notice that there were defects in the concrete floors in the Facilities. Defendant claims this notice was untimely. (Def.'s Mem., at 9.) Plaintiff responds that this May 3, 1999 notice was timely because it came "within one year after completion of 'Punch List Items.'" (Pl.'s Mem., at 3.)[49] Plaintiff implies that the floors themselves constituted "Punch List Items" as that term is defined in the Purchase Agreements. Defendant argues that the floors were not Punch List Items as the floors in both Facilities were complete and there were no Punch List Items relating to construction of the

---

[49]     Plaintiff claims that the term "punch list" should be given its "generic meaning" as used in the construction industry, but provides no support for this contention. (Pl.'s Mem., at 3 n.3.) In the court's view, Plaintiff's position is contrary to the plain language of the Construction Guaranties, in which Defendant guarantees that the Kellogg Facility, "other than the Punch List Items (*as such term is defined in the Purchase Agreement*), if any, shall be free of defects for a period of one year . . . ." (emphasis added). The court notes, nevertheless, that Plaintiff argues in the alternative that the floors were "Punch List Items" as defined in the Purchase Agreements.

floors as of the Lease Commencement Date.[50] (Def.'s Reply Mem., at 2-5.)

As noted earlier, the Purchase Agreements define "Punch List Items" as items related to the initial construction of the Improvements which may be required to be completed (1) "under any applicable temporary or permanent certificate of occupancy, or any similar instrument issued by a governmental or quasi-governmental authority in order to permit occupancy of the Improvements," or (2) under the Lease (but which do not affect commencement of the Lease term). (Ex. I to Purchase Agreements.) Regarding the first definition of "Punch List Items," Plaintiff implicitly argues that the floors were required to be completed under a permanent certificate of occupancy and, thus, that the one-year warranty period for the floors did not commence until the final certificate of occupancy was issued. (Pl.'s Mem., at 4-5.)[51] Defendant urges, in the court's view correctly, that there is no evidence that any items related to floor construction were required to be completed under the final certificate for either Facility.[52] (Def.'s Reply Mem., at 3.) Plaintiff has thus failed to show that the floors meet the first definition of Punch List Items.

In the court's view, however, the floors may meet the second definition of Punch List Items—items related to the initial construction of the Improvements which may be required to be completed under the Lease (but which do not affect commencement of the Lease term). Although neither party has addressed whether the floors were required to be completed under the Leases, the court notes that the Leases stipulate that the floors in the warehouse and truck dock area must be constructed of six-inch unreinforced concrete slabs, while the office area floor must consist of

---

[50] As noted earlier, Defendant implicitly concedes that the Clorox Facility parking lots may be "Punch List Items" under the Clorox Agreement, as it acknowledges that Plaintiff "may arguably have made a claim with respect to the parking lots of the Clorox facility within one year of their completion as Punch List Items." (Def.'s Mem., at 9.)

[51] Neither party has addressed whether the Facilities' concrete floors were "related to the initial construction of the Improvements," but common sense dictates that a warehouse facility must have floors in order to operate initially.

[52] See notes 19, 33.

25

four-inch unreinforced concrete slabs. (Ex. B to Leases, at 2, 4.) Moreover, Defendant has not argued that the floors affected commencement of the Lease term; one might expect that floors must be in place and functional before the beginning of the Lease term, but it also seems possible that floors might be functional even without being "complete," if that term implies such steps as drying and application of joint filler, for example. Drawing all inferences in favor of Plaintiff, the non-moving party, the court will assume for purposes of this motion that the floors were required to be completed under the Leases and, thus, do constitute Punch List Items.[53]

Plaintiff is barred from pursuing claims for the concrete floors under the Construction Guaranties, then, only if it did not notify Defendant of problems with the floors within "one year from the date on which each Punch List Item has been completed." As May 3, 1999 is the date Plaintiff first gave Defendant notice regarding problems with the floors, the court must determine whether a genuine issue of material fact exists such that a reasonable jury could conclude that the floors in either Facility were not completed as of May 3, 1998. The court will consider each Facility in turn.

The deposition testimony shows that Defendant finished pouring and, therefore, "placed"

---

[53]    Plaintiff implicitly argues, in the alternative, that the one-year warranty period could not commence until Defendant and Exel reached agreement that the floors had been completed, as required for the one-year warranty period under the Leases, and that as Defendant and Exel never reached such agreement, the one-year warranty period under the Construction Guaranties never commenced either. (Pl.'s Mem., at 5.) Section 2.4 of the Leases provides that, for items that were not completed as of the Lease Commencement Date, the one-year warranty period commenced on "the date such items were completed as agreed by Landlord and Tenant . . . ." As Kurelac stated that he never agreed that work on the concrete floors had been completed or that the warranty period had started, (Kurelac Aff. ¶ 6), Plaintiff argues, the agreement between Defendant and Exel required under § 2.4 "was never reached," and, therefore, the warranty period under the Construction Guaranties never began to run. The court finds Plaintiff's arguments without merit. The Construction Guaranties do not provide that Defendant and Exel must agree before the one-year warranty period commences. Whether Defendant and Exel ever reached agreement that the one year warranty period under the *Leases* had commenced, therefore, has no bearing on when such period commenced under the *Construction Guaranties*.

the Kellogg Facility concrete floors in December 1997.[54] Defendant claims that, as of January 6, 1998, the date the Kellogg Lease commenced, "construction of the concrete floors was complete, and there were no punch list items relating to the initial construction of the concrete floors." (Def.'s 56.1 ¶ 15.) To support this assertion, Defendant notes that a list of items outstanding as of January 14, 1998 identified only one item relating to the construction of the concrete floors in the Kellogg Facility—"conc[rete] floor sealer"—which item was completed on December 31, 1997. (Ex. 19 to Def.'s 56.1, at 3; Caesar Aff. ¶ 5.) Defendant also cites the deposition of Keith Coleman, the Exel Construction Manager, in which he testified that, to his knowledge, the Kellogg Facility concrete floors had been completed as of January 6, 1998. (Coleman Dep., at 12, 36-37.) Plaintiff insists that the floors were not complete as of January 6, 1998, noting that Kurelac stated that he "did not agree work [on the Kellogg Facility floors] was completed or the warranty period had started because consistent[] with what Mr. Caesar had told me, I felt I needed to wait until the drying out and shrinkage process had ended and I needed to see what happened regarding the joint filler work." (Kurelac Aff. ¶ 6.)

Essentially, then, the record contains conflicting deposition testimony, affidavits, and documents regarding when construction of the concrete floors in the Kellogg Facility was "completed" as of May 3, 1998. Defendant offers testimonial evidence that construction was completed as of January 6, 1998, as well as documentary evidence that the concrete floor sealer was completed on December 31, 1997 and there were no other items related to the construction of the concrete floors in the Kellogg Facility as of January 14, 1998. Plaintiff offers an affidavit stating that the floors were not complete as of late spring 1998 because the "drying out and

---

[54] As noted earlier, in his deposition, Caesar testified that Defendant began pouring the Kellogg Facility floors during approximately the first week of November 1997 and finished pouring the floors on or around the second week of December 1997, five weeks later. (Caesar Dep., at 93-94.) Further, Kurelac stated that the floors in the Kellogg Facility "were placed in approximately December 1997." (Kurelac Aff. ¶ 4.)

shrinkage process" had not yet ended. Unfortunately, the parties do not identify at what point construction of concrete floors are considered "completed" from a structural engineering perspective, and the record does not provide a clear answer. Further, the term "completed" is arguably ambiguous, susceptible to more than one reasonable interpretation as applied to concrete floor construction. Although neither party has addressed the matter, under Illinois law, "[t]he determination of whether a contract is ambiguous is a question of law for the court." *Shields Pork Plus, Inc. v. Swiss Valley Ag Serv.*, 329 Ill.App.3d 305, 311, 767 N.E.2d 945, 949 (4th Dist. 2002). If the court determines that contract language is ambiguous, "extrinsic evidence is admissible to determine the parties' intent and interpretation of the language is a question of fact." *Installco Inc. v. Whiting Corp.*, 336 Ill.App.3d 776, 784, 784 N.E.2d 312, 320 (1st Dist. 2002). The parties have not explicitly presented their interpretations of the definition of the term "completed" in the Purchase Agreements with regard to floor construction, but the court concludes that their understandings differ: Defendant believes floors are completed when pouring is complete or shortly thereafter, while Plaintiff opines they are completed only after "the drying out and shrinkage process" has ended. Extrinsic evidence is thus admissible to determine the parties' intent, and interpretation of the term "completed" with regard to floor construction is a question for the factfinder. Viewing the facts in the light most favorable to Plaintiff, a reasonable factfinder could conclude that the concrete floors were not "completed" as of May 3, 1998. Summary judgment as to the Kellogg Facility floors must be denied.

Similarly, the court finds that the term "completed" is ambiguous with regard to the concrete floors in the Clorox Facility, and a genuine issue of fact exists as to whether construction of the floors was completed as of May 3, 1998. As noted above, Defendant claims that, as of March 30, 1998 or, at the latest, April 13, 1998, initial "construction of the concrete floors was complete and there were no punch list items relating to the initial construction of the concrete floors." (Def.'s 56.1 ¶ 27; Def.'s Resp. 56.1 ¶ 73.) Defendant notes that, according to Coleman and Bradley Flaugher,

Defendant's Construction Project Manager for the Clorox Facility, there are no items related to the construction of the concrete floors in the Clorox Facility in an April 13, 1998 list of items related to the initial construction of the Clorox Facility which were not completed as of March 30, 1998. (Ex. 25 to Def.'s 56.1; Flaugher Aff. ¶ 5; Coleman Dep., at 51-57.)[55] Defendant also notes that, in response to the question, "Ignoring the Certificate of Occupancy, do the status reports and the time line and the April 13 punch list document lead you to conclude that the floors were complete by April 13, in any event?" Coleman stated, "I would say they were complete," and, in response to the question whether concrete curling had been a problem before June 10, 1998, Coleman stated, "No, because we'd probably just gotten on starting to use the floor[s] for [their] intended use sometime between . . . the last May 28th punch list" and June 10. (Coleman Dep., at 56-57, 64-65; Exs. 36, 82 to Pl.'s 56.1, at 4.)

As noted earlier, Plaintiff claims that, "if the word 'complete' is intended to suggest that the floors as placed were suitable and in accordance with the applicable specifications," then construction of the Clorox Facility concrete floors was not complete as of March 30, 1998. (Pl.'s 56.1 ¶ 27.) To support this contention, Plaintiff notes that Coleman implied that he did not know whether Exel, his employer, had "accepted" the floors. (Coleman Dep., at 57.)

Defendant, then, offers Coleman's testimony that floor construction had been completed as of March 30, 1998, as well an April 13, 1998 punch list document that did not mention the floors. Plaintiff notes that Coleman implied that he did not know whether Exel, his employer, had "accepted" the floors. In the court's view, Plaintiff's evidence is a slender reed on which to base its contention that floor construction was not completed. Drawing all inferences in favor of Plaintiff,

---

[55] As discussed in note 24, Flaugher states in his affidavit that this document is "a punch list . . . listing items related to the initial construction of the Clorox facility which were not completed as of the issuance of the Temporary Certificate of Occupancy on March 30, 1998." (Flaugher Aff. ¶ 5.) Again, although the document itself does not indicate that these items were incomplete as of March 30, 1998, the court accepts as true the uncontested assertions of Flaugher's affidavit for purposes of this summary judgment motion.

however, a reasonable jury could conclude that construction of the floors was not completed as of May 3, 1998 in light of the following facts: (1) concrete pouring for the Clorox Facility floors had apparently been completed only two months earlier[56]; (2) Kurelac believes that floor construction is not completed "until the drying out and shrinkage process" has ended; and (3) Defendant has not identified at what point construction of concrete floors are considered "completed" from a structural engineering perspective. Further, as discussed above, the term "completed" in the Agreements is ambiguous with regard to concrete floors. Summary judgment must therefore be denied as to Plaintiff's claims regarding construction of the Clorox Facility floors. Nevertheless, if Defendant can show that construction of those floors had been completed within two months after the concrete was poured, Plaintiff's claims under the Construction Guaranties will be barred.

## B. Does Illinois Law Bar Application of the One-Year Notice Provisions?

### 1. Contractual Limitation Periods

Plaintiff argues that even if the court ultimately were to conclude that it was tardy in asserting its warranty claims, this case should proceed, as Defendant "is applying the one-year periods in the construction guaranties as if they were contractually specified statutes of limitation." (Pl.'s Mem., at 6.) Plaintiff asserts that "the clauses should not be read that way." (Id.) Even if the clauses should be interpreted as contractual limitation periods, Plaintiff contends, they cannot be used to bar Plaintiff's claims. In the court's view, the one-year warranty periods in the Construction Guaranties are not contractually-specified statutes of limitation, as they do not bar Plaintiff from filing a lawsuit outside of the one-year periods. Indeed, Defendant does not argue that Plaintiff was barred from filing a lawsuit to enforce the Construction Guaranties because the one-year period

---

[56] As noted earlier, although Defendant never bothers to identify in its submissions when the concrete for the Clorox Facility floors was poured, the record indicates that the warehouse "shell building" had been "completely enclosed" and heating of the building had begun by February 3, 1998, and that concrete pouring for the floors began on February 4, 1998 and was completed on March 5, 1998. (Exs. 27-30 to Def.'s 56.1.)

had expired. Instead, the Construction Guaranties state that Defendant will not be required to repair or replace a Punch List Item if Plaintiff fails to provide written notice of defects in such item within one year after the item's completion. Nevertheless, as Defendant appears to have joined the issue, and as it relates to any action to enforce the Purchase Agreements (although Plaintiff has not mentioned such relationship), the court will briefly address this argument.

Plaintiff acknowledges that parties to a contract may agree to a shortened limitations period to replace a statute of limitations, so long as it is reasonable. *Medrano v. Prod. Eng'g Co.*, 332 Ill.App.3d 562, 566, 774 N.E.2d 371, 376 (1st Dist. 2002). Plaintiff argues that the one-year contractual limitations in the Construction Guaranties should not be enforced because Plaintiff was unable to discover the problems and defects with the floors until the April 1999 walk-through with Defendant and Exel. (Pl.'s Mem., at 8-9.) According to Plaintiff, "[t]he weight of authority is that contractual limitations of one year or shorter should only be upheld where the shorter contractual limitation period starts once the plaintiff had knowledge of the cause of action." (*Id.* at 8.)

Defendant does not challenge Plaintiff's claim that Plaintiff was unable to discover the problems and defects with the floors until the April 1999 meeting. Instead, Defendant argues, in the court's view correctly, that none of the cases Plaintiff cites supports the proposition that the time period does not run until a Plaintiff had notice of the defect. Indeed, two of the courts in the cases Plaintiff cites upheld one-year contractual limitations, despite the fact that the contractual limitation period started before the plaintiff had knowledge of the cause of action. *See Florsheim v. Travelers Indem. Co.*, 75 Ill.App.3d 298, 393 N.E.2d 1223 (1st Dist. 1979); *Camelot Excavating Co., Inc. v. St. Paul Fire and Marine Ins. Co.*, 410 Mich. 118, 301 N.W.2d 275 (1981); *see also Village of Lake in the Hills v. Ill. Emcasco Ins. Co.*, 153 Ill.App.3d 815, 506 N.E.2d 681 (2d Dist. 1987) (cited by Defendant).[57]

_____

[57]     Plaintiff also cites *Capehart v. Heady*, 206 Cal.App.2d 386, 23 Cal.Rptr. 851 (1962),
(continued...)

In the court's view, the cases that Plaintiff cites (all of which were decided by courts in other circuits) in which courts deemed a contractual limitation unreasonable are distinguishable. The court in *Order of United Commercial Travelers of America v. Duncan*, 221 F.2d 703 (6th Cir. 1955), which involved a six-month limitation, stated that a limitation provision "which does not leave to the assured a reasonable time in which to bring suit after his cause of action accrues is void and of no effect," and noted that "[u]nder Michigan law it is a question of fact for the jury whether the bylaws and regulations of a mutual benefit association are reasonable or unreasonable." *Id.* at 706, 708 (quoting *Appel v. Cooper Ins. Co.*, 76 Ohio St. 52, 60, 80 N.E. 955, 958 (1907)). In this case, Plaintiff has not suggested that under Illinois law the reasonableness of a contractual limitation is a question of fact for the jury. In *Salisbury v. Art Van Furniture*, 938 F. Supp. 435 (W.D. Mich. 1996), also involving a six-month limitation, the court concluded that the contractual limitation at issue effected a "practical abrogation" of the plaintiff's right to file an ADA claim, as the ADA requires a plaintiff to file a complaint with the Equal Employment Opportunity Commission ("EEOC") and precludes the plaintiff from initiating a cause of action while the EEOC is reviewing the claim. *Id.* at 438 (citing *Camelot Excavating*, 410 Mich. at 127, 301 N.W.2d 275 (1981)). In this case, Plaintiff has not suggested that there is any applicable federal statute or that it has filed

---

[57](...continued)
in which a lease barred any claim or defense by the lessee unless asserted by the lessee within three months. *Id.* at 388, 23 Cal.Rptr. 851. The lessee interpreted this three-month contractual limitation as starting to run from the time it learned of a breach by the landlord, rather than from the time of the actual breach. *Id.* at 853, 23 Cal.Rptr. 851. The court found that, even if the lessee's interpretation were correct, it could not complain, since it waited more than seven months after learning of the landlord's alleged breach to file suit. *Id.*, 23 Cal.Rptr. 851. The California court's forty-year-old holding hardly constitutes authority for Plaintiff's argument that in Illinois, "contractual limitations of one year or shorter should only be upheld where the shorter contractual limitation period starts once the plaintiff had knowledge of the cause of action." (Pl.'s Mem., at 8.)

In addition, Plaintiff cites *Schweickhardt v. Jokers*, 250 Ill.App. 77 (3d Dist. 1928), in which the court found that the plaintiff had an express agreement with her mother that she was to be paid at the time of her mother's death for services rendered in caring for her mother. *Id.* at 80-81. The court concluded that the statute of limitations did not begin to run until the mother's death. *Id.* at 81. There was no contractual limitation, and Plaintiff has failed to explain how *Schweickhardt* is relevant to the contractual limitation at issue in this case.

an administrative charge with a state agency during which the contractual limitation in the Construction Guaranties should be tolled. Finally, the court in *Page County v. Fidelity & Deposit Co. of Maryland*, 205 Iowa 798, 216 N.W. 957 (1927), deemed unreasonable a provision in a depository bond barring the filing of a suit prior to 60 days after default or subsequent to 90 days after default, as it came "very close to an abrogation of the right of action." Plaintiff has failed to identify any cases–in Illinois or elsewhere–in which a *one-year* limitation was deemed unreasonable or found to work an "abrogation of the right of action."

Plaintiff also argues that the notice provisions in the Construction Guaranties are not conditions precedent to its right to bring a claim "because notice is not stated to be a condition precedent." (Pl.'s Mem., at 9.) "Illinois courts define a condition precedent as one which must be performed either before a contract becomes effective or which is to be performed by one party to an existing contract before the other party is obligated to perform." *MXL Indus., Inc. v. Mulder*, 252 Ill.App.3d 18, 25, 623 N.E.2d 369, 374 (2d Dist. 1993). The court presumes Plaintiff is contending that notice may be a condition precedent only if a contract explicitly states that it is. Such a rule does not appear in any of the cases Plaintiff cites. *See May v. Nat'l Life Ins. Co.*, No. 96 C 616, 1997 WL 461085 (N.D. Ill. Aug. 8, 1997); *Dial v. Mihalic*, 107 Ill.App.3d 855, 438 N.E.2d 546 (1st Dist. 1982); *Global Fire Protection Co. v. State of Illinois*, 46 Ill. Ct. Cl. 195, 1994 WL 868065 (1994). In any event, it is clear that notice is in fact a condition precedent to Defendant's obligations under the Construction Guaranties. As noted earlier, the Guaranties provide, "In the event that any defect which is covered by the terms of this Construction Guaranty occurs, and *[Plaintiff] provides written notice thereof to [Defendant], within such one[]-year period*, [Defendant] agrees, at its sole cost and expense, to repair or replace such defective Improvements." Defendant's obligation to "repair or replace" defective Improvements is only triggered if Plaintiff provides notice within the applicable one-year periods.

Alternatively, Plaintiff urges that Defendant "must establish that it was prejudiced by

[Plaintiff's] allegedly late notice for [Plaintiff's] claims to be barred." (Pl.'s Mem., at 9-10.) To support this proposition, Plaintiff cites two Illinois cases that examine the relationship between an insurer and an insured. First, in *Fremont Indemnity Co. v. Special Earth Equipment Corp.*, 131 Ill.App.3d 108, 474 N.E.2d 926 (5th Dist. 1985), the court stated that the general rule in Illinois is that a judgment does not bind an insurer unless the insurer had notice of the pendency of the action. *Id.* at 116, 474 N.E.2d at 933 (citations omitted). The court added, however, that as a matter of law, the insurer's claim of lack of notice did not entitle it to summary judgment where the insurer had not shown prejudice. *Id.* at 117, 474 N.E.2d at 933 (citation omitted). Second, in *Kerr v. Illinois Central Railroad Co.*, 283 Ill.App.3d 574, 670 N.E.2d 759 (1st Dist. 1996), the court stated that "[p]rejudice to the insurer is a factor to consider in determining the reasonableness of notice." *Id.* at 584, 670 N.E.2d at 767. "If an insurer can show prejudice, it is more likely that the notice it received was not reasonable." *Id.* The court concluded, "Whether prejudice occurred is usually a question of fact for the jury, but it may be decided on a motion for summary judgment if there is no factual basis from which the jury could conclude otherwise." *Id.* at 585, 670 N.E.2d at 767.

Plaintiff does not explain the relevance of either of these cases. Both courts stated general rules that apply to disputes regarding whether an insured must provide notice to its insurer of actions or judgments against the insured. There is no suggestion that either party here is an insurer, or that one party has a duty to indemnify the other for expenses relating to a legal proceeding. Plaintiff presents no authority for its argument that a contracting party must show that it was prejudiced by the other party's failure to provide timely written notice in order to enforce a contractual limitation. Plaintiff's claim that Defendant must establish such prejudice thus fails.[58]

---

[58] Plaintiff also argues that, even if notice is a condition precedent to Defendant's obligations, Defendant waived the requirement of written notice within the one-year warranty period "by its representations and conduct." (Pl.'s Mem., at 10.) As the court finds that genuine disputes
(continued...)

## II.    Can Plaintiff Recover under the Purchase Agreements?

Plaintiff claims that it may recover under §§ 5(a)(vi), 5(c), and 5(a)(viii)(F) of the Purchase Agreements. (Pl.'s Mem., at 12-14.) As discussed above, under § 7, subject to § 5(c), any cause of action based on a breach or default of representations and warranties set forth in each Agreement automatically expires if not brought within one year after the Agreement's Closing Date–December 22, 1997 for the Kellogg Facility and April 15, 1998 for the Clorox Facility. As Plaintiff filed its Complaint in this case on November 2, 2001–more than four years and three-and-a-half years, respectively, after the Closing Dates, § 7 bars any such claims unless they are brought pursuant to § 5(c). As § 5(c) constitutes an exception to § 7, and as § 5(c) references § 5(a)(vi), in the court's view § 7 does not bar Plaintiff from bringing claims under §§ 5(c) and 5(a)(vi). Further, although § 7 may bar Plaintiff from bringing claims under §5(a)(viii)(F), the court finds that Plaintiff cannot bring claims under that section in any event. The court considers these provisions in turn.

### A.    Section 5(a)(vi)

Plaintiff notes that, in § 5(a)(vi), Defendant represents and warrants that, "[s]ubject to any latent defects . . . the major structural, mechanical and electrical systems included among the Improvements are in good working order and condition to perform the work or function for which they are intended." (Pl.'s Mem., at 12-13.) As described earlier, the parties agree that the concrete floors are part of the Facilities' structural system. (Pl.'s 56.1 ¶¶ 45, 55; Def.'s Resp. 56.1 ¶¶ 45, 55.) Plaintiff notes that as of November 8, 1997, the date the Purchase Agreements were executed, Defendant had not completed the concrete floors in either Facility. (Pl.'s Mem., at 13.) Plaintiff contends, therefore, that when the Agreements were executed, the floors were not "in good

---

[58](...continued)
of material fact exist as to when the Facilities' floors were completed, the court need not determine whether a genuine dispute exists regarding whether Defendant waived such warranty periods.

working order and condition to perform the work or function for which they are intended." (*Id.*) Plaintiff also contends that the floors were not in good working order and condition because "traffic was permitted . . . on the floors prior to the time it should have been, the floors were poured during cold weather conditions which was a concern (not disclosed to [Plaintiff]), and no joint filler had been installed, or was planned to be installed." (*Id.*) Plaintiff additionally claims that Defendant "at this time admits" that its failure to install joint filler "made the floors defective."[59] (*Id.*)

Defendant points to the fact that § 5(a)(vi) is subject to "any latent defects" and emphasizes that Plaintiff itself claims it was unable to discover the problems and defects with the floors until the April 1999 walk-through with Defendant and Exel. (Def.'s Reply Mem.,[60] at 14 (citing Pl.'s Mem., at 8-9).) Further, Defendant notes that Plaintiff's May 3, 1999 letter to Defendant claimed that Plaintiff had "discovered certain *latent defects* in the concrete slabs and floors in both . . . properties." (Ex. 56 to Pl.'s 56.1 (emphasis added).) In the court's view, however, the question whether the problems in the concrete floors are latent defects is a question for the factfinder to determine. As § 5(a)(vi) itself does not provide any remedies, Plaintiff would necessarily bring any warranty claims under the Purchase Agreements pursuant to § 5(c), discussed below.

## B.    Section 5(c)

Under § 5(c) of the Purchase Agreements, if Defendant became aware between the date of the Agreement and the Closing Date that any of its representations and warranties set forth in § 5(a)(vi) of the Agreement were "no longer true and correct because of events occurring between the date of this Agreement and the Closing Date," Defendant was to notify Plaintiff of this fact "promptly" in writing. (*Id.* at 13-14.) If, after reasonable efforts within ten days after such written

---

[59]    As noted earlier, however, Kurelac claims that Caesar and he agreed that Defendant would place the joint filler in the Kellogg Facility, "and we would sort out at a later time who would be responsible for needed repairs to the joint filler." (Kurleac Aff. ¶ 4.)

[60]    Defendant's Reply Memorandum in Support of Its Motion for Partial Summary Judgment.

notice, Defendant were unable to cure the problems, Plaintiff could elect either (a) to terminate the Agreement, or (b) to waive any such incorrect representations and warranties. As Defendant provided no such written notice, Plaintiff claims that, "at the time of the closing, the representations and warranties [in § 5(c)] stood." (*Id.* at 14.)

Section 5(c) is silent regarding Plaintiff's remedies in the event that Defendant fails to provide notice that it is aware during the prescribed period that the warranties in § 5(a)(vi) have become untrue because of events occurring during that period. The section does provide that if such defects were the result of "affirmative acts, omissions, negligence or willful misconduct" on Defendant's part, Plaintiff may, at any time, recover any and all damages as a result of the warranty being incorrect, limited to (1) certain tax benefits Plaintiff would have obtained had it elected a like-kind property exchange with a third party pursuant to § 16(b), (2) costs and expenses Plaintiff incurred in preparation for the consummation of the transaction (including fees paid to consultants in connection with Plaintiff's due diligence efforts and attorneys' fees and costs), and (3) other direct damages, not including indirect, consequential, special, or punitive damages. In the court's view, Defendant's view that the provisions of § 5(c) never arise if it fails to give such notice would render the provision meaningless, as Defendant could simply sit on such information and never notify Plaintiff, thereby evading its obligations under the provision. Defendant's obligation to report such defects during the prescribed period cannot properly be considered a "warranty" and, therefore, is not discharged one year after the Agreement's Closing Date under § 7. If Defendant became aware during the relevant period of any defects in the concrete floors because of events occurring during that period, Defendant may be liable for the damages prescribed in § 5(c). Whether Defendant was aware of any such defects during the relevant period is for the factfinder to resolve and therefore Plaintiff may be able to make out a claim under § 5(c).[61]

---

[61]     Plaintiff claims that the "indemnity clauses" in the Purchase Agreements (§§ 9(d)(v),
(continued...)

## C.    Section 5(a)(viii)(F)

Plaintiff also points to § 5(a)(viii)(F) of the Purchase Agreements, in which Defendant represents and warrants that, except for its ongoing maintenance responsibilities under the Lease and *except for the Punch List Items*, "all alterations, installations, decorations and other work required to be performed by [Defendant], as lessor, under the provisions of the Lease have been completed, or will be completed on or before the Closing Date." Plaintiff claims that Defendant had not in fact completed all work as of the Closing Date for either Facility. (Pl.'s Mem., at 13.) Although Defendant does not address this argument, the court notes that § 5(a)(viii)(F) by its terms applies only to items that are not Punch List Items. Plaintiff urges throughout its submissions that the floors are in fact Punch List Items. Plaintiff cannot have it both ways and argue that the floors are *not* Punch List Items for purposes of § 5(a)(viii)(F).

## III.    Claims Relating to Parking Lots

Defendant contends that Plaintiff is barred from asserting any claims relating to the parking lots of the Kellogg Facility and the Kellogg Addition. (Def.'s Motion, at 3; Def.'s Mem., at 9.) First, Defendant claims that Plaintiff "made no written claim with regard to the parking lots of the Kellogg Facility and those claims are . . . barred." (Def.'s Mem., at 9.) Defendant also claims that Plaintiff is barred from asserting any claims relating to parking lots in the Kellogg Addition, as Plaintiff's May 3, 1999 notice made no reference to those parking lots. (*Id.*) Plaintiff does not respond to these contentions, and thus has failed to carry its burden "to come forward with specific facts in the record that demonstrate there is a genuine issue for trial." *Morfin v. City of East Chicago*, 349 F.3d 989, 997 (7th Cir. 2003).

---

[61](...continued)
15) also provide a cause of action, (Pl.'s Mem., at 14; Pl.'s 56.1 ¶¶ 50, 60); Defendant denies this assertion. (Def.'s Resp. 56.1 ¶¶ 50, 60.) In the court's view, there is no evidence from which a reasonable jury could conclude that any third parties have asserted claims against Plaintiff for which Plaintiff could seek indemnification.

## CONCLUSION

Plaintiff has failed to demonstrate there is a genuine issue for trial regarding the parking lots of the Kellogg Facility and the Kellogg Addition. Genuine disputes exist regarding whether the concrete floors may constitute "Punch List Items" and whether Plaintiff notified Defendant of problems with the concrete floors in the Kellogg Facility and Clorox Facility within the applicable one-year limitation periods. Therefore, Defendant's motion for summary judgment (Doc. 15-1) is granted in part and denied in part. Specifically, the motion is granted as to Plaintiff's claims regarding the parking lots of the Kellogg Facility and the Kellogg Addition, and denied without prejudice as to Plaintiff's claims regarding the floors in the Facilities and the parking lots of the Kellogg Facility. Further, as Defendant does not seek summary judgment as to Plaintiff's claims regarding the concrete floors in the Kellogg Addition and the parking lots of the Clorox Facility, this order does not dispose of such claims. The court cautions that even if Plaintiff prevails at trial, the damages it may recover are limited by the express terms of the parties' agreements. The parties are encourage to attempt to reach a settlement.

ENTER:

Dated: March 25, 2004

REBECCA R. PALLMEYER
United States District Judge

39